**In the Matter of K L K FURS, INC., Debtor.**

**David M. GREEN, as Trustee of the Estate of KLK Furs, Inc., Debtor, Plaintiff,**

v.

**D. D. JOSEPH TRADING COMPANY, INC., Defendant.**

**Bankruptcy No. 80 B 12266.**

United States Bankruptcy Court, S. D. New York.

June 30, 1981.

D. Joseph Trading Company, Inc. ("D. D. Joseph"), allegedly due from the latter to the estate of the debtor, K. L. K. Furs, Inc. ("debtor").[5]

## A

### CONTENTION OF THE PARTIES

The trustee alleges that prior to the filing of an involuntary petition against the debtor, under Chapter 7,[6] the debtor consigned to defendant, D. D. Joseph, six fur jackets valued at $6,270. The trustee maintains that he is entitled either to a turnover of the jackets or the value thereof.

The defendant, as an affirmative defense to the trustee's complaint, alleges that the six fur jackets were delivered by the debtor to defendant in consideration of, and as security for, the extension of credit in the amount of $18,952, by the latter to the debtor. Since the debtor, according to the defendant, has defaulted on the payment of that sum extended to the debtor and due the defendant, D. D. Joseph maintains that the trustee's proceeding should be dismissed.

David Green, New York City, Trustee.

Horvath & Young, New York City, for D. D. Joseph Trading, Inc.; Leonard Rosenthal, New York City, of counsel.

## MEMORANDUM OPINION

JOEL LEWITTES, Bankruptcy Judge.

■ In this adversary proceeding[1] tried to the Court, the Chapter 7[2] trustee[3] seeks a turnover[4] of money from defendant, D.

## B

### EVIDENCE ADDUCED AT TRIAL

Prior to the August 4, 1980 filing of an involuntary petition against the debtor, the debtor was engaged in the manufacture, sale, and purchase of fur jackets, stoles, and capes. It often purchased fur skins from the defendant D. D. Joseph which had extended credit to the debtor in the approximate amount of $12,000.

---

1. Part VII of the Rules of Bankruptcy Procedure governs a proceeding in this Court seeking, *inter alia*, to recover money or property. *See* Bankruptcy Rule 701, 411 U.S. 1068, 93 S.Ct. 3147, 37 L.Ed.2d lxvi. Although this case is governed by the Bankruptcy Reform Act of 1978, Bankruptcy Rule 701, in place on the effective date of the Reform Act, is applicable here since it is not inconsistent with the Reform Act. *See* Bankruptcy Reform Act of 1978 § 405(d). We note that the Preliminary Draft of Proposed New Bankruptcy Rules, March 1982, retains a provision identical to Rule 701(1) as proposed Bankruptcy Rule 7001(1).

2. A Chapter 7 case, under the Bankruptcy Reform Act of 1978, is a liquidation case. *See* 11 U.S.C. § 701 *et seq.*

3. A trustee, by statute, is accorded the capacity "to sue or be sued." *See* 11 U.S.C. § 323(b).

4. 11 U.S.C. § 542.

5. The Bankruptcy Reform Act of 1978 casts the trustee in the role of "the representative of the estate." 11 U.S.C. § 323(a).

6. 11 U.S.C. § 303(a).

On June 10, 1980 the debtor purchased mink skins valued at $9,000 from D. D. Joseph for which the debtor gave two promissory notes to D. D. Joseph; each in the amount of $4,500. At the time of this purchase by the debtor, the latter owed D. D. Joseph $9,952. When the debtor made this additional $9,000 purchase, it therefore exceeded the $12,000 credit limit by $6,952. Thereafter, on June 20, 1980 debtor delivered to defendant six fur coats, valued at $6,270 thus maintaining the credit extended by D. D. Joseph to the debtor within the aforestated credit limit.

These six fur coats were invoiced on the debtor's memo bill which set forth that this merchandise was sent to D. D. Joseph as consignee. The legend, printed on the face of the bill recites that

> "The merchandise described herein is consigned on memorandum only. It is received by the consignee upon the express agreement that title to this merchandise and to the proceeds thereof to the extent of the within invoiced prices shall be and remain in the consignor until the actual payment of the invoice prices. The acceptance of a check, note or draft shall not in any way take title away from the consignor, but said check, note or draft shall be deemed collateral security. The consignee shall be responsible for any loss accruing through fire, burglary, or any other reason whatsoever, while the merchandise remains in the possession of the consignee."

At the trial, the debtor's president testified that the debtor seldom did business on a memorandum basis. He further affirmed that the six furs were delivered to defendant and that if the latter sold the fur coats, the proceeds thereof would be set off by defendant to reduce the debt owed by the debtor to D. D. Joseph.

Mr. Kobren, the vice-president of defendant D. D. Joseph, testified that on June 10, 1980, when the debtor purchased $9,000 worth of skins from the defendant, exceeding the debtor's credit limit, the debtor was told that in addition to the two promissory notes each in the amount of $4,500, additional security was required. Accordingly, the six fur coats were delivered by the debtor to defendant. Kobren stated, at trial, that if the coats were sold, whatever proceeds therefor were received would be deducted from the amount owed by the debtor to it. If the fur coats either remained unsold or were deemed to be unsatisfactory, Kobren testified, the coats would be returned to the debtor if the latter's obligations on the promissory notes were discharged.

Kobren's testimony further revealed that upon receipt of the six fur coats, D. D. Joseph ticketed them and shipped them to its California office where the coats were sold. The proceeds of their sale were not segregated from proceeds of D. D. Joseph's other sales.

### C

### DISCUSSION

Defendant's defense to the trustee's turnover proceeding necessarily presents two questions for our consideration: (1) whether its agreement with the debtor created a security interest in the six fur coats and (2) whether the defendant perfected its interest, in accordance with New York law, prior to the filing of the bankruptcy petition.

### (1)

The informal business dealings engaged in between the debtor and defendant tend to blur the particular type of commercial transaction actually forged. Yet, because disparate business transactions yield varying legal consequences, we must, on the evidence adduced, discover what the parties objectively [7] intended to accomplish when they commercially embraced. Simply put,

---

7. Cf. Gilmore, Security Interests in Personal Property § 11.2 at 338 (1965) (creation of security interest by lease or consignment). See also White and Summers, Uniform Commercial Code § 23–3 at 905 (1980) (whether a written agreement creates or provides for a security interest).

was "the transaction to have effect as security?"[8]

The defendant's vice-president testified that

"I told him [debtor's president] in order for him to get the additional amount from us he would have to give us some type of security for the additional amount. We decided upon—I told him that I will give him his credit limit, twelve thousand dollars, and anything above that he must give us security in an amount above that."[9]

Mr. Kampf, the debtor's president, in response to a question on cross-examination as to whether there were any further conversations had with defendant as to the purpose behind debtor's delivery of the six fur coats to defendant, responded:

"As I said, he requested that we should deliver some goods in order to be able to get the skins from them because they wouldn't extend credit to us unless we gave them something."[10]

Although the six fur coats were invoiced on debtor's consignment memorandum, which, parenthetically was not signed by defendant, the objective intention of the parties evidenced that the defendant was to hold the six furs, or the proceeds thereof, as security for payment by the debtor of its obligations in excess of the debtor's original credit line.[11]

Uniform Commercial Code § 9–203[12] requires four steps to be taken by "a prospective secured party"[13] in order to create a security interest:

"(1) Enter into a security agreement with the debtor,

(2) Reduce necessary parts of the agreement to a writing signed by the debtor or [as here] obtain possession of the collateral pursuant to agreement.

(3) See to it that the debtor has 'rights in the collateral' and

(4) Give value."[14]

In my view, each of the elements is present and based upon the actions and conduct of the parties, as expressed in their testimony before me, a security interest was created in six fur coats delivered by the debtor to the defendant.

### (2)

It is clear, under the U.C.C., that a security interest in goods may be perfected by the secured party's possession, as here, of the collateral.[15] This perfection, which statutorily is granted as coincident with the time of possession, necessarily requires this Court to hold that the defendant perfected its security interest in the fur coats on June 20, 1981, more than one month prior to the filing of the bankruptcy petition. Although the fur coats were subsequently sold by the defendant, once the defendant's interest in the original collateral was perfected, such interest in the "proceeds"[16] of the collateral

---

**8.** N. Y. Uniform Commercial Code § 9–102 Official Comment 1 (McKinney).

**9.** Trial Transcript at 20.

**10.** Trial Transcript at 13.

**11.** This analysis by the way, militates against the trustee's claim for turnover based upon an alleged consignment arrangement. A true consignment preserves the consignor's title to and control of the consigned goods unless such goods are sold by the consignee. *See* Gilmore, Security Interests in Personal Property, *supra* § 3.5 at 73–4. *Cf. Looney v. Nuss (In re Miller),* 545 F.2d 916 (5th Cir. 1977), *cert. denied sub nom. Nuss v. Looney,* 430 U.S. 987, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977) (where the Court held that the irreversible consignment amounted to the granting of a security interest in the goods).

**12.** N. Y. Uniform Commercial Code § 9–203 (McKinney 1981).

**13.** White and Summer, *supra* § 23–2 at 902.

**14.** *Id.* There is no dispute that the debtor had "rights in the collateral" and it is beyond dispute that the defendant gave value for its security interest under the terms of N. Y. Uniform Commercial Code § 1–201(44) (McKinney).

**15.** N. Y. Uniform Commercial Code § 9–305 (McKinney 1981).

**16.** N. Y. Uniform Commercial Code § 9–306(1) (McKinney 1981).

became "also a continuously perfected interest.".[17]

The hypothetical status of the trustee under the present Bankruptcy Code,[18] as was the case under the former 1898 Bankruptcy Act, must be determined as of the time the case is commenced.[19] Since the defendant's security interest was perfected prior to the filing of the bankruptcy petition, the "strong arm" power of the trustee is rendered impotent and the instant turnover proceeding must fail.

The foregoing consists of this Court's findings of fact and conclusions of law in accordance with Rules of Bankruptcy Procedure, Rule 752(a),[20] this Court's procedural mate to Fed.R.Civ.P. 52(a).

Settle an order on three (3) days notice in conformity with this decision.

---

17. Anderson, Uniform Commercial Code § 9–306:6 at 303 (1971). *See also* N. Y. Uniform Commercial Code § 9–306(3) (McKinney 1981). The fact that the proceeds from the sale of the six fur coats were commingled with the defendant's other moneys or proceeds, provides no solace to the trustee under N. Y. Uniform Commercial Code § 9–306(4) (McKinney). That section, of course, deals with the right of a secured creditor, in the event of an insolvency proceeding, where the collateral or proceeds are held, unlike the instant proceeding, by the debtor.

18. 11 U.S.C. § 544(a).

19. *Lewis v. Manufacturers National Bank*, 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323 (1961).

20. 411 U.S. 1082, 93 S.Ct. 3158, 37 L.Ed.2d lxxii.